Mary Sue **GUNTHER**, Plaintiff,

v.

**CHARLOTTE BASEBALL, INC.**, Defendant.

**Civ. A. No. 0:93–1210–17.**

United States District Court, D. South Carolina, Rock Hill Division.

June 7, 1994.

Jim Anders and James M. Whitlark, Fedor, Anders, Massey & Whitlark, Columbia, SC, for plaintiff.

James C. Cothran, Jr., Holcombe, Bomar, Cothran & Gunn, Spartanburg, SC, for defendant.

## MEMORANDUM OPINION AND ORDER

JOSEPH F. ANDERSON, Jr., District Judge.

On May 22, 1990, Mary Sue Gunther was invited by a friend to attend her first baseball game, a minor league contest between the Triple A–Charlotte Knights and the Jacksonville Suns. Unfortunately, during the game a foul ball struck the plaintiff in the face, causing severe and painful injuries. Gunther thereafter initiated this action against Charlotte Baseball, Inc., the owner of the Knights and the stadium in which they play. Gunther's complaint alleges negligence in the design and operation of the park.

The matter is now before the court upon the defendant's motion for summary judgment. The case presents a question of first impression in South Carolina: whether a patron at a baseball game assumes the risk of injury incurred by being struck by a batted ball. For the reasons stated below, the court has concluded that the South Carolina Supreme Court would answer this question in the affirmative. Accordingly, summary judgment must be granted to the defendant.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962). When the defendant is the moving party and the plaintiff has the ultimate burden of proof on an issue, the defendant must identify the parts of the record that demonstrate the plaintiff lacks sufficient evidence. The nonmoving party, here the plaintiff, must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Viewed in the light most favorable to the plaintiff, the facts are as follows: Gunther, a thirty-seven year-old woman from New York, was in Charlotte, North Carolina on a business trip. While there, she accepted a friend's invitation to attend a game at the Charlotte Knight's newly christened field, known as "Knights' Castle," located across the South Carolina border in Fort Mill, South Carolina. Gunther contends that she had never before attended a baseball game, although she acknowledged that she had watched the sport on television "in passing."

Gunther occupied a seat in the second row of bleachers (one row away from the field) behind the third-base dugout and eighty-one feet from home plate. Throughout the game, a mascot walked back and forth on top of the third-base dugout to entertain the fans.

The standard practice of the Charlotte organization is to warn the spectators via the public address system several times about the hazards of foul balls: once before the game begins and two or three times during the game. The pre-game warning is given directly before the singing of the National Anthem, and other warnings are given at appropriate times during the game. Gunther contends that she arrived at the stadium as the game was beginning, thus missing the first warning, and that she was injured in approximately the third inning,[1] before any subsequent warnings were given.[2]

Immediately before the plaintiff was struck by the foul ball, another ball was fouled back onto the press box, shattering the glass window and causing Gunther to divert her attention momentarily to the press box area, over her right shoulder. As she turned back to watch the game, a second foul ball struck Gunther squarely in the face, causing serious injuries to her face and to the bony orbit encasing her eye.

The Knights' stadium, described by its owners as a "state of the art" facility, was in its maiden season when Gunther's injury occurred. Approximately twenty home games had been played there prior to the game Gunther attended. The plaintiff has produced a newspaper article from a local newspaper regarding her injury, which indicates that the press box glass had been shattered by foul balls on three or four occasions prior to the May 22 game. Plaintiff contends that these earlier incidents served as notice to the defendant that its facility was defectively designed and that balls shattering the press box glass on regular occasions would foreseeably distract fans, diverting their attention from the game and rendering them vulnerable to foul balls hit in their direction.

The defendant takes issue with the plaintiff's contention regarding prior incidents of broken glass. The defendant argues that the newspaper article is inadmissible hearsay and that a search of its own records has failed to turn up repair orders for shattered press box glass prior to Gunther's injury. The defendant's general manager, Marc Farka, acknowledged at his deposition that several other glass breaking incidents occurred, although he could not say with certainty whether they occurred before or after Gunther's injury. Additionally, a memorandum of a June 21 meeting between the Knights' owner and the stadium's architect to discuss "unfinished work [and] other issues" indicates that the architect was instructed to look into the possibility of installing shatterproof glass in the press box. Therefore, mindful of the obligation to consider the inferences to be drawn from the evidence in the light most favorable to the plaintiff, the court will assume that several glass breaking episodes pre-dated Gunther's injury.

The undisputed evidence indicates that the screen behind home plate at the Knights' stadium is the highest in the league and extends almost from dugout to dugout. Although it is possible to extend the protective screen further, the Charlotte organization

---

1. The defendant contends that the injury actually occurred in the fifth inning. This difference is not significant for purposes of the motion presently before the court. The court will assume that the plaintiff did not hear any of the warnings given over the public address system.

2. The record indicates that no warning was printed on the game tickets. The record also indicates that Gunther's friend purchased the ticket and turned it in at the stadium gate; thus, Gunther never even saw her ticket.

(like most clubs around the country) chose not to do so, because some fans wish to have a completely unobstructed view of the game.

As noted previously, Gunther contends that she had never before witnessed a live performance of what has been described as our national pastime. She had, however, seen portions of games on television when other family members watched them. At her deposition, Gunther could not recall whether she had seen any other foul balls leave the field prior to the one that shattered the press box glass. She acknowledged, however, that she realized the ball comes off the bat with power. She stated: "They hit it. They hit it hard. Their goal is to get it out of the stadium, you know, or make a home run." Specifically, the plaintiff's deposition included the following:

Q. Would you assume that if the ball is coming at the batter from another pitcher, sometimes hard and sometimes not, depending on the pitch, and a batter swings back at the ball real hard, the ball is going to go somewhere fast?

A. Yes.

Q. You just didn't believe it would come in the stands?

A. No. Well, not that it wouldn't come into the stands, but I never assumed that it would hit me in the face.

Q. You thought it would come into the stands, but it wouldn't hit you?

A. Sometimes you see a ball go into the bleachers. That's my assumption.

Q. Where do you consider the bleachers?

A. Way up.

Q. So, in other words, your assumption was that the ball would go way past you, but not go near you?

A. Yeah. Usually they loft high.

Q. You weren't aware that also the ball could hit the bat and go low?

A. Not really, no.

Plaintiff's deposition, pp. 13–14.

The South Carolina Supreme Court has never had occasion to apply the assumption of risk doctrine to spectators at baseball games. Thus, this court must predict how the South Carolina court would rule if squarely presented with the issue. "In applying state law in diversity cases, [a] federal court ... must apply the law that it conscientiously believes would have been applied in the state court system." 19 Charles A. Wright et al., Federal Practice and Procedure § 4507, at 88–89. In deciding how the courts of South Carolina would rule, the court is authorized to consider "all available legal sources, including restatements of the law, treatises, law review commentaries, decisions from other jurisdictions whose doctrinal approach is substantially the same, and 'the majority rule.'" *Id.* at 100–03.

The overwhelming weight of authority from other jurisdictions holds that baseball patrons assume the risk of being struck at games.[3] The California Supreme Court stated this dominant position nearly sixty years ago:

[O]ne of the natural risks assumed by spectators attending professional games is that of being struck by batted or thrown balls; ... the management is not required, nor does it undertake to insure patrons against injury from such source.... [If] a spectator chooses to occupy an unscreened seat, or ... is unable to secure a screened seat and consequently occupies one that is not protected, he assumes the risk of being struck by thrown or batted balls; and, if injured thereby, is precluded from recovering damages therefrom.

*Quinn v. Recreation Park Ass'n,* 3 Cal.2d 725, 46 P.2d 144, 146 (1935).

One element of plaintiff's argument is that she was so unexposed to the game of baseball that she could not appreciate the danger of foul balls. Other courts have discussed this issue, however, and have concluded that a plaintiff's ignorance of the game is no excuse:

In our opinion no adult of reasonable intelligence, even with the limited experience of the plaintiff, could fail to realize that he would be injured if he was struck by a thrown or batted ball.... No one of ordi-

---

**3.** For a collection of cases involving injuries to baseball spectators see generally James L. Rigelhaupt, Annotation, *Liability to Spectator at Base-* *ball Game who Is Hit by Ball or Injured as Result of Other Hazards of Game,* 91 A.L.R.3d 24 (1979).

nary intelligence could see many innings of the ordinary league game without coming to a full realization that batters cannot, and do not, control the direction of the ball which they strike and that foul tips or liners may go in an entirely unexpected direction. . . . It is our opinion that the plaintiff, notwithstanding his alleged limited experience, must be held to have assumed the risk of the hazards to which he was exposed.

*Brisson v. Minneapolis Baseball & Athletic Ass'n*, 185 Minn. 507, 240 N.W. 903, 904 (1932).

By 1950, the law of liability to baseball spectators was firmly entrenched in the doctrine of assumption of risk. For example, in a case involving an injury to a spectator by a hockey puck, the Court of Appeals for the District of Columbia Circuit stated:

There have been many decisions involving this question in cases where spectators were injured at sporting events, primarily in attending baseball games. In the baseball cases, with few exceptions, it generally has been held that, as a matter of law, the spectator assumes the risk of the normal hazards of watching such a game; and that, as a matter of law, the danger of being hit by a ball which flies into an unscreened area is a normal hazard, within the common knowledge possessed by reasonably prudent persons.

*Uline Ice, Inc. v. Sullivan*, 187 F.2d 82, 85 (D.C.Cir.1950).

The general rule in these cases is that "by voluntarily entering into the sport as a spectator [plaintiff] knowingly accepts the reasonable risks and hazard in and incident to the game." *Brown v. San Francisco Ball Club, Inc.*, 99 Cal.App.2d 484, 222 P.2d 19, 20 (1950). The *Brown* court also noted that

management does not have a duty to screen all seats, because some patrons prefer to sit with an unobstructed view. The *Brown* case provides further instruction here, because plaintiff Brown had been at the game for about an hour when she was struck—a period that the court concluded should have apprised her of the dangers of foul balls. Moreover, Ms. Brown spent the hour she attended by talking to a friend and generally ignoring play of the game. Similarly, plaintiff Gunther was seated at the stadium for at least three innings. However, unlike the plaintiff in *Brown*, Gunther testified that she paid attention to the game for the entire time she was there.

Unfortunately for plaintiff Gunther and others, the hazard of being struck by a foul ball will always exist.[4] Nonetheless, the vast majority of jurisdictions recognize this hazard to be a risk that is assumed by the spectators because it remains after due care has been exercised (erecting a screen), and it is not the result of negligence by the ball club.[5] *Anderson v. Kansas City Baseball Club*, 231 S.W.2d 170 (Mo.1950).

Dean Prosser summarized the law in this area as follows: "Those who participate or sit as spectators at sports and amusements may be taken to assume the known risks of being hurt by a roller coasters, flying baseballs . . . [and] fireworks explosions." WILLIAM L. PROSSER & W. PAGE KEATON, LAW OF TORTS, § 68, at 485–86 (5th ed. 1984). Justice Cordozo applied this principle by declaring succinctly, if cavalierly, "The timorous may stay at home." *Murphy v. Steeplechase Amusement Co.*, 250 N.Y. 479, 166 N.E. 173, 174 (1929).

Although the courts of South Carolina have never applied the assumption of the risk

---

4. Columnist George Will, a baseball aficionado, once waxed eloquently about baseballs and the directions in which they travel:

Other sports are played in a strictly defined space, like a basketball court or a football field, but baseball has what one writer (George Drells) calls a "potential for infinity." Even foul balls are in play until they land in the stands, and if you remove the stands, the field of play would extend forever through 360 degrees. The Republic, the planet, the *universe* would be an extended baseball field.

GEORGE F. WILL, THE PURSUIT OF VIRTUE AND OTHER TORY NOTIONS, p. 358. New York: Simon & Schuster (1982).

5. The record indicates that the Charlotte Knights furnish the umpires with four dozen baseballs at the beginning of each contest, but receive very few balls back from the umpires at the end of the game. This evidence indicates that a substantial number of balls are fouled into the stands during each game.

doctrine in the context of a baseball game, they have applied the doctrine in a variety of other traditional settings. *E.g., Meadows v. Heritage Village Church & Missionary Fellowship, Inc.,* 305 S.C. 375, 409 S.E.2d 349 (1991) (plaintiff slipped on wet grass of hotel grounds and injured her back while returning from parking lot); *Huckaby v. Confederate Motor Speedway, Inc.,* 276 S.C. 629, 281 S.E.2d 223 (1981) (plaintiff voluntarily participated in automobile race at speedway); *Canady v. Martschink Beer Distributors, Inc.,* 255 S.C. 119, 177 S. E.2d 475 (1970) (plaintiff voluntarily participated in drinking activities and remained in automobile even though he knew of driver's intoxicated condition); *Hallman v. Pointe Arcadia Horizontal Property Regime, Inc.,* 303 S.C. 555, 402 S.E.2d 493 (Ct.App.1991) (plaintiff slipped and fell on snow and ice on ground on the way to annual meeting of condominium association members); *Faile v. Bycura,* 297 S.C. 58, 374 S.E.2d 687 (Ct.App.1988) (plaintiff voluntarily submitted to medical procedure to remove heel spurs); *Senn v. Sun Printing Co.,* 295 S.C. 169, 367 S.E.2d 456 (Ct.App. 1988) (plaintiff fell in defendant's parking lot when she walked along the crumbling edge of a pothole).

In *Senn v. Sun Printing Co.,* 295 S.C. 169, 367 S.E.2d 456 (Ct.App.1988), the South Carolina Court of Appeals summarized the assumption of the risk doctrine in South Carolina:

> The doctrine of assumption of risk, also known as *volenti non fit injuria,* means legally that a plaintiff may not recover for an injury to which he assents.... The requirements for the defense of *volenti non fit injuria* are: (1) the plaintiff has knowledge of the facts constituting a dangerous condition, (2) he knows the condition is dangerous, (3) he appreciates the nature and extent of the danger, and (4) he voluntarily exposes himself to the danger.

*Id.,* 367 S.E.2d at 458.

In *Hoeffner v. The Citadel,* 429 S.E.2d 190, 193 (S.C.1993), the South Carolina Supreme Court reaffirmed those elements: "In the absence of express consent to assume the risk, the plaintiff's conduct can be said to imply assumption of the risk where it is shown that he understood and appreciated a known danger created by the defendant, and then freely and voluntarily exposed himself to it."

Recognizing the overwhelming weight of authority against her, the plaintiff hinges her argument upon *Callander v. Charleston Doughnut Corp.,* 305 S.C. 123, 406 S.E.2d 361 (1991), which adopted the Restatement (Second) of Torts in a premises liability case. In *Callander,* the court embraced § 343A of the Restatement and comment (f). Section 343A provides:

> Known or Obvious Dangers
>
> (1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, *unless the possessor should anticipate the harm despite such knowledge or obviousness.*

RESTATEMENT (SECOND) OF TORTS § 343A (1965), *quoted in Callander,* 406 S.E.2d at 362 (emphasis supplied by South Carolina Supreme Court). Comment (f) to § 343A cautions that an owner may be required to warn an invitee, or to take other reasonable steps to protect an invitee, if the "possessor has reason to expect that the invitee's attention may be distracted so that he will not discover what is obvious, ... or fail to protect himself against it." RESTATEMENT (SECOND) OF TORTS § 343A cmt. f., at 220–21.

Here, the plaintiff asserts that the owner of the baseball stadium was put on notice that its new park was designed in a manner that allowed foul balls frequently to break the glass enclosing the press box. The plaintiff argues that the defendant's notice gives rise to liability when a spectator is struck while turning to look at the broken glass, because the premises owner has reason to expect that spectators may be injured when their attention is diverted by these foreseeable distractions.

Although this argument has some superficial appeal, the court is constrained, after due reflection, to reject it. One must remember that baseball games, like other sporting events, routinely involve distractions. For example, soft drink and peanut

vendors, giant team mascots, raffles for prizes, and high-tech scoreboards all compete for the attention of patrons who attend athletic events. Fans who attend games expect, and apparently enjoy, these distractions. Such distractions are at least as foreseeable to the spectators as they are to the owners of the premises.

If the court were to apply the Restatement's foreseeable distraction doctrine in a rigid fashion to factual situations such as that presented in the instant case, then the exception to the assumption of the risk doctrine would soon swallow up the rule. Under these circumstances, the court is convinced that, if presented with the facts of this case, the South Carolina Supreme Court would conclude that the plaintiff voluntarily assumed the risk of her injuries and that her action in this court thus fails as a matter of law.

For all of the foregoing reasons, the defendant's motion for summary judgment is hereby granted.

IT IS SO ORDERED.