# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2010-NMSC-043

Filing Date: September 3, 2010

Docket No. 31,907

EDWARD C. and JANIS C., individually and as parents of
EMILIO C., RACHEL C., and CASSANDRA G., minor children,

 Plaintiffs-Respondents,

v.

CITY OF ALBUQUERQUE,

 Defendant-Petitioner.

<u>Consolidated with</u>:

Docket No. 31,917

EDWARD C. and JANIS C., individually and as parents of
EMILIO C., RACHEL C., and CASSANDRA G., minor children,

 Plaintiffs-Respondents,

v.

ALBUQUERQUE BASEBALL CLUB,
L.L.C., d/b/a ALBUQUERQUE ISOTOPES,

 Defendant-Petitioner.

ORIGINAL PROCEEDINGS ON CERTIORARI
Richard J. Knowles, District Court Judge

Robert M. White
Michael I. Garcia
Albuquerque, NM

for Petitioner City of Albuquerque

1

Butt, Thornton & Baehr, P.C.
S. Carolyn Ramos
Sean E. Garrett
Emily A. Franke
Albuquerque, NM

for Petitioner Albuquerque Baseball Club, L.L.C.

Vigil Law Firm, P.A.
Jacob G. Vigil
Albuquerque, NM

L. Helen Bennett, P.C.
L. Helen Bennett
Albuquerque, NM

for Respondents

Michael B. Browde
Albuquerque, NM

Law Office of William E.  Snead
William E. Snead
Albuquerque, NM

for Amicus Curiae
New Mexico Trial Lawyers Association

McNerney, Page, Vanderlin & Hall
Benjamin E. Landon
Williamsport, PA

for Amicus Curiae
Little League Baseball, Incorporated

Miller Stratvert P.A.
Ruth Fuess
Albuquerque, NM

Holme, Roberts & Owen, L.L.P.
Steven B. Smith
Brent E. Rychener
Colorado Springs, CO

2

for Amicus Curiae
Pacific Coast League of Professional
Baseball Clubs, Inc.

Geiger Law Offices, P.C.
Mark P. Geiger
Albuquerque, NM

for Amicus Curiae
The New Mexico Activities Association

## OPINION

**CHÁVEZ, Justice.**

**{1}** In this case, it is alleged that a child was struck in the head by a baseball during pre-game batting practice at Isotopes stadium. The child was seated in the picnic area beyond the left field wall in fair ball territory with his family for a pre-game Little League party. The child had just begun to eat his food when, without warning, pre-game batting practice began and a baseball struck him, fracturing his skull. Plaintiffs sued the Albuquerque Baseball Club, LLC d/b/a Albuquerque Isotopes (Isotopes), the City of Albuquerque (City), Houston McLane Co. d/b/a Houston Astros (Astros), and Dave Matranga, the player who batted the ball that struck the child (collectively "Defendants").

**{2}** The question we must answer is what duty do owner/occupants of commercial baseball stadiums have to protect spectators from projectiles leaving the field of play. The district court applied the most limited duty, which is followed in a minority of jurisdictions, commonly referred to as the "baseball rule." The district court held that the duty was limited to providing screening for the area of the field behind home plate for as many spectators as may reasonably be expected to desire such protection. Because Isotopes stadium has such screening, the district court granted summary judgment to Defendants.

**{3}** On appeal, the Court of Appeals reversed summary judgment regarding the City and the Isotopes "on the ground that, under the particular circumstances alleged, there are issues of material fact precluding summary judgment" and rejected application of a limited-duty baseball rule, holding instead that these Defendants owed a duty to exercise ordinary care. *Crespin v. Albuquerque Baseball Club, LLC*, 2009-NMCA-105, ¶¶ 1, 13, 147 N.M. 62, 216 P.3d 827. We granted certiorari to decide whether New Mexico should recognize a limited duty for owner/occupants of commercial baseball stadiums.

**{4}** Considering the nature of the sport of baseball, which involves spectator participation and a desire to catch balls that leave the field of play, contrary to the Court of Appeals majority opinion, we believe that a limited-duty rule, albeit not the one argued for by Defendants, is warranted by sound policy considerations. Accordingly, we hold that an

3

owner/occupant of a commercial baseball stadium owes a duty that is symmetrical to the duty of the spectator. The spectator must exercise ordinary care to protect himself or herself from the inherent risk of being hit by a projectile that leaves the field of play and the owner/occupant must exercise ordinary care not to increase that inherent risk.

{5}     In this case, it is alleged that the injured child was not in an area dedicated solely to viewing the game, but was in the picnic area with tables positioned perpendicular to the field of play. This type of area can be described as a multi-purpose area. It is alleged that, without warning, batting practice commenced when the child was hit by a baseball that left the field of play. Given the scope of duty that we define today and Plaintiffs' allegations, we conclude that, on the record before us, Defendants did not make a prima facie showing entitling them to summary judgment.

## I.     BACKGROUND

{6}     Plaintiffs and their four-year-old son, Emilio, two-year-old daughter, Rachel, and ten-year-old daughter, Cassandra, were attending a Little League party at Isotopes stadium. The City owns the stadium, which is leased by the Isotopes. Plaintiffs were in the stadium's picnic area, located beyond the left field wall in fair ball territory. They "had just sat down with [their] hot dogs and drinks" and had "just begun to eat [their] meals, when without a warning from anyone at the ball park a baseball struck Emilio in the head." During pre-game batting practice, New Orleans Zephyrs player Dave Matranga batted a ball out of the park into the picnic area, striking Emilio "in the upper right portion of his head fracturing his skull." The picnic tables in the left field stands are arranged in alignment with the left field foul line, so that seated individuals are not directly facing the field of play, but face perpendicular to the action. Isotopes stadium has a screen or protective netting between home plate and the seats behind home plate, but has no screen or protective netting between home plate and the seats beyond the left field wall.

{7}     Plaintiffs allege that injury to Emilio was foreseeable and Defendants owed a duty to exercise ordinary care for his safety. Plaintiffs contend that the central issue is whether Defendants breached the duty of ordinary care by not screening the picnic area, when that area was designed so that patrons are not focused on the game or pre-game activities, and by failing to warn Plaintiffs that batting practice had begun. Under these facts, Plaintiffs argue, "the issue of negligence . . . should be reserved for the jury to determine with reference to the facts of the particular case," and to compare Defendants' fault with any fault that might be attributable to Plaintiffs.

{8}     Defendants contend that before the question of breach of duty can be addressed, the court must determine the scope of duty. They argue that baseball is a unique spectator sport and "justifies a specific definition of the duty owed by operators of baseball facilities." They explain that "baseball subjects spectators to an inherent risk of being struck by a batted ball . . . [yet m]ost spectators . . . prefer to sit in an area where they can watch the game without the obstruction of a screen . . . [and have] the opportunity to . . . catch a . . . ball [that leaves

4

the playing field]." (Citations omitted.) Because proprietors of ball parks have a legitimate interest in catering to these desires, their duty should be limited.

**{9}** Defendants argue that the Court of Appeals conferred upon the jury, not the courts, "the power to decide the legal question of what duty of care exists in the context of a baseball game" (emphasis omitted) when it applied the duty of ordinary care. "It left the question unanswered as to where an owner or operator's duty begins." The result, Defendants claim, is that "[t]here would be no predictability as to how one might satisfy an ever-changing duty that different fact finders might decide."

**{10}** Defendants urge this Court to adopt a limited-duty baseball rule that is satisfied when the owner/occupant of a baseball stadium provides a screened area behind home plate with adequate seating for those seeking protection. "Where a spectator rejects the protected seating and opts for seating that is not, or is less, protected the owner or operator is not liable." As will be discussed *infra*, the baseball rule proposed by Defendants and adopted by the district court is the most limited and is followed only by a minority of jurisdictions in this country.

**{11}** Plaintiffs contend that the baseball rule proposed by Defendants does little to promote safety because it offers "little incentive to examine new methods of keeping fans safe." "Where, as in this case, the attending public is specifically invited *not* to give their full attention to the field, the baseball rule cannot fairly be applied." Plaintiffs also contend that the baseball rule is inconsistent with New Mexico's system of pure comparative fault because the rule is a "species" of the assumption of risk defense, which was abolished in New Mexico along with other "all or nothing" defenses. (Internal quotation marks omitted.)

**{12}** Defendants respond by contending that there is nothing inconsistent with our comparative fault system "because where the duty ends, there can be no negligence to impute." "The baseball rule specifically defines the duty of ordinary care owed in the limited context of what protection must be provided to spectators from baseballs that leave the field of play." Therefore, nothing about the rule conflicts with comparative negligence and "many of the twenty plus states to adopt the baseball rule have done so by defining the duty of ordinary care owed in the context of a comparative negligence setting." Finally, Defendants argue that "failure to adopt the baseball rule . . . will isolate New Mexico from almost every other jurisdiction to consider the issue and have a significant, adverse social and economic impact on citizens of this State."

**{13}** The district court was persuaded by Defendants' argument and granted summary judgment in their favor, concluding that New Mexico would adopt their version of the baseball rule, and therefore Defendants satisfied their duty as a matter of law. On appeal, the Court of Appeals affirmed summary judgment in favor of the Astros and Matranga. *Crespin*, 2009-NMCA-105, ¶ 35. The basis for affirming summary judgment in their favor was that they were "simply the personification of the game in this case," *id.* ¶ 30, which is to say that Matranga "was simply playing baseball according to the rules and doing what his

5

employer, the Astros, wanted him to do," *id.* ¶ 31, which was to hit home runs. Reversing summary judgment for the City and the Isotopes, the Court of Appeals held that absent adoption of their proposed baseball rule, "Plaintiffs' allegations raise issues of fact regarding the actions the Isotopes and/or the City might reasonably be expected to take in order to protect spectators in the picnic area." *Id.* ¶ 28. The Court of Appeals held that a duty of ordinary care, not a limited duty defined by the baseball rule, is the appropriate standard applicable in New Mexico. *Id.* ¶ 13.

## II.    A LIMITED DUTY FOR OWNER/OCCUPANTS OF BASEBALL STADIUMS IS APPROPRIATE

**{14}**    What duty should owner/occupants of a baseball stadium in New Mexico have to protect spectators from projectiles that leave the field of play? The question of the existence and scope of a defendant's duty of care is a legal question that depends on the nature of the sport or activity in question, the parties' general relationship to the activity, and public policy considerations. *See Schear v. Bd. of Cnty. Comm'rs*, 101 N.M. 671, 672, 687 P.2d 728, 729 (1984). Policy is the principal factor in determining whether a duty is owed and the scope of that duty. *Torres v. State*, 119 N.M. 609, 612, 894 P.2d 386, 389 (1995) ("Policy determines duty."); *Calkins v. Cox Estates*, 110 N.M. 59, 62, 792 P.2d 36, 39 (1990) ("The existence of a duty is a question of policy to be determined with reference to legal precedent, statutes, and other principles comprising the law.").

**{15}**    New Mexico recognizes two categories of legal duty:  (1) an "affirmative duty to conform one's actions to a specific standard of care" in relation to "a specific individual or group of individuals" created by a "specific statutory or common-law standard"; and (2) a "defensive" duty that is the "general negligence standard, requiring the individual to use reasonable care in his activities and dealings" in relation to "society as a whole." *Calkins*, 110 N.M. at 62 n.1, 792 P.2d at 39 n.1; *see Herrera v. Quality Pontiac*, 2003-NMSC-018, ¶ 12, 134 N.M. 43, 73 P.3d 181 (following analytical structure laid out in *Calkins* looking first for a specifically defined statutory duty then a specifically defined common-law duty).

**{16}**    "As a general rule, an individual has no duty to protect another from harm." *Grover v. Stechel*, 2002-NMCA-049, ¶ 11, 132 N.M. 140, 45 P.3d 80. Certain relationships, such as a possessor of land and a visitor, however, give rise to such a duty. *Id.* The special relationship between Defendants, as owners and occupants of Isotopes stadium, and Plaintiffs, as visitors, places Defendants' duty within the first category. Indeed, Defendants do not dispute that a duty is owed; they simply argue that the scope of that duty should be limited.

**{17}**    New Mexico generally applies a "single standard of reasonable care under the circumstances" to landowners or occupants. *Ford v. Bd. of Cnty. Comm'rs*, 118 N.M. 134, 138, 879 P.2d 766, 770 (1994) (abolishing the distinction between invitees and licensees but not trespassers, because trespassers have "no basis for claiming extended protection" and such "would place an unfair burden on a landowner who has no reason to expect a

6

trespasser's presence" (internal quotation marks and citation omitted)). In *Ford*, we articulated the standard of reasonable care as follows:

> A landowner or occupier of premises must act as a reasonable man in maintaining his property in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to another, the seriousness of the injury, and the burden of avoiding the risk. This duty of care shall extend to all persons, other than trespassers, who enter property with the defendant's consent, express or implied.

*Id.* at 139, 879 P.2d at 771. Accordingly, our jury instructions provide that "[a]n [owner] [occupant] owes a visitor the duty to use ordinary care to keep the premises safe for use by the visitor[, whether or not a dangerous condition is obvious]." UJI 13-1309 NMRA. UJI 13-1603 NMRA provides guidance on what constitutes "ordinary care."

> "Ordinary care" is that care which a reasonably prudent person would use in the conduct of the person's own affairs. What constitutes "ordinary care" varies with the nature of what is being done.
>
> As the risk of danger that should reasonably be foreseen increases, the amount of care required also increases. In deciding whether ordinary care has been used, the conduct in question must be considered in the light of all the surrounding circumstances.

*Id.*

**{18}** The Court of Appeals determined that ordinary care was the applicable standard because "Emilio and his injury were []foreseeable," and "[c]onsequently, all Defendants owed Emilio a duty to exercise ordinary care for his safety." *Crespin*, 2009-NMCA-105, ¶ 13. Foreseeability, however, is but one factor to consider when determining duty and not the principal question. *See* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 7 cmt. j (2010) (disapproving the use of foreseeability to limit liability in preference for "articulat[ing] polic[ies] or principle[s] . . . to facilitate more transparent explanations of the reasons for a no-duty [or limited-duty] ruling and to protect the traditional function of the jury as factfinder"). Instead, "duty is a policy question that is answered by reference to legal precedent, statutes, and other principles of law." *Herrera*, 2003-NMSC-018, ¶ 7 (internal quotation marks and citation omitted).

**{19}** In considering the policy implications of adopting the baseball rule, the Court of Appeals determined "that there is no compelling reason to immunize the owners/occupiers of baseball stadiums" because "[c]omparative negligence principles allow the fact finder to take into account the risks that spectators voluntarily accept when they attend baseball games as well as the ability of stadium owners to guard against unreasonable risks that are not essential to the game itself." *Crespin*, 2009-NMCA-105, ¶ 23. This Court's restatement of

7

New Mexico's uniform jury instruction in *Bober v. New Mexico State Fair*, 111 N.M. 644, 648, 808 P.2d 614, 618 (1991), that "'[e]very person has a duty to exercise ordinary care for the safety of the person and the property of others'" (quoting UJI 13-1604 NMRA), seemingly drove the Court of Appeals' rationale. The Court of Appeals determined that rejection of the baseball rule is consistent with our move "'towards a public policy that defines duty under a universal standard of ordinary care, a standard which holds all citizens accountable for the reasonableness of their actions.'" *Crespin*, 2009-NMCA-105, ¶ 24 (quoting *Yount v. Johnson*, 1996-NMCA-046, ¶ 4, 121 N.M. 585, 915 P.2d 341).

**{20}** To determine whether New Mexico's duty of ordinary care for owners/occupants is appropriate in the context of commercial baseball, we will review baseball spectator injury cases from other jurisdictions for comparison to our owner/occupant duty framework. In doing so, we look for instances where courts have imposed a duty other than the duty to exercise ordinary care that are supported by sound policy consistent with New Mexico's pure comparative fault system and a general interest in promoting safety, welfare, and fairness.

**{21}** The approach we take is consistent with the approach suggested by the American Law Institute. The Restatement notes that modification of duty is appropriate in situations when "reasonable minds could differ about the application of the negligence standard to a particular category of recurring facts." Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 7 cmt. i. The American Law Institute notes that courts can "render a judgment about that category of cases" under "the rubric of duty" taking "into account factors that might escape the jury's attention in a particular case, such as the overall social impact of imposing a significant precautionary obligation on a class of actors." *Id.* "Such a categorical determination . . . has the benefit of providing clearer rules of behavior for actors who may be subject to tort liability and who structure their behavior in response to that potential liability." *Id.*

### III. THE HISTORY AND DEVELOPMENT OF A BASEBALL RULE

**{22}** The first recorded baseball game in America was played in 1846 on Elysian Fields in Hoboken, New Jersey, just across the Hudson River from New York City between the Knickerbocker Base Ball Club and the New York Nine. Leonard Koppett, *Koppett's Concise History of Major League Baseball* 5, 7 (2004).[1] The era's restrictive rules meant that the game with balls pitched underhand was less dangerous than the style of baseball played today. *See* Robert M. Gorman & David Weeks, *Death at the Ballpark: A Comprehensive Study of Game-Related Fatalities of Players, Other Personnel and*

---

[1]Available online at http://books.google.com/books?id=cjrbVkGAsHcC& printsec=frontcover&dq=Leonard+Koppett&source=bl&ots=kJL8Pgvcyn&sig=GW37m XHRtbJNCMz6kzlpvJ9ERC0&hl=en&ei=4C98TIi-AZCRnwfgwIydCw&sa=X&oi=boo k_result&ct=result&resnum=10&ved=0CDkQ6AEwCQ#v=onepage&q&f=false

*Spectators in Amateur and Professional Baseball, 1862-2007* 9, 131 (2009). By the 1880s, the rules of the game had been modified to allow pitchers to throw overhand, catchers wore masks and chest protectors, and the grandstand area behind home plate became known as the "slaughter pen," apparently because of the frequent injuries suffered by spectators watching the game from that area. J. Gordon Hylton, *A Foul Ball in the Courtroom: The Baseball Spectator Injury as a Case of First Impression*, 38 Tulsa L. Rev. 485, 488 (2003); *see also* Gorman & Weeks, *supra* at 131. It was not until 1879 that the first professional team, the Providence Grays, installed a screen behind home plate for the express purpose of protecting spectators. Hylton, *supra* at 488; Gorman & Weeks, *supra* at 131. However, "[i]n spite of the safety they provided, the new screens were not always well received. In Milwaukee . . . a wire screen was erected in front of the grandstand on June 25, 1884, but was removed seven days later because of fan complaints about the obstructed view." Hylton, *supra* at 488. Nonetheless, "by the late 1880s, it was commonplace . . . to screen in the portion of the grandstand directly behind homeplate," leaving the rest of the grandstand area and bleacher seats "unscreened and unprotected." *Id.* The reason stated for leaving most of the spectator stands unprotected was that "many field-level fans do not want screens or other protective devices in these areas because they feel their views will be degraded, foul ball catching opportunities will be decreased, or the intimate feeling derived from sitting close to the action will be reduced." Gorman & Weeks, *supra* at 132.

{23}    The limited protective screening behind home plate, however, failed to eliminate spectator injuries and did not curtail burgeoning plaintiffs' claims. As a result, more baseball spectator injury cases came under appellate review, *see* Gil Fried & Robin Ammon, *Baseball Spectators' Assumption of Risk: Is it 'Fair' or 'Foul'?*, 13 Marq. Sports L. Rev. 39, 42 (2002), and courts responded by developing a baseball-specific jurisprudence. Courts almost universally adopted some form of what is known as the "baseball rule," creating on the part of ball park owners and occupants only a limited duty of care toward baseball spectators. *See Benejam v. Detroit Tigers, Inc.*, 635 N.W.2d 219, 221 (Mich. Ct. App. 2001) ("Our review of precedents from other jurisdictions finds overwhelming, if not universal, support for the limited duty rule that defendant advocates." (footnote omitted)); *see*, *e.g.*, *Crane v. Kan. City Baseball & Exhibition Co.*, 153 S.W. 1076, 1077 (Mo. Ct. App. 1913) (holding that defendants had a duty "of providing seats protected by screening from wildly thrown or foul balls," which is fulfilled by providing screened seats and giving patrons "the opportunity of occupying one of those seats"). In its most limited form, the baseball rule holds

> that where a proprietor of a ball park furnishes screening for the area of the field behind home plate where the danger of being struck by a ball is the greatest and that screening is of sufficient extent to provide adequate protection for as many spectators as may reasonably be expected to desire such seating in the course of an ordinary game, the proprietor fulfills the duty of care imposed by law and, therefore, cannot be liable in negligence.

*Akins v. Glens Falls City Sch. Dist.*, 424 N.E.2d 531, 534 (N.Y. 1981).

**{24}** From the earliest cases, the legal theories underlying the baseball rule precluding recovery have been the doctrines of assumption of risk and contributory negligence. *See Quinn v. Recreation Park Ass'n*, 46 P.2d 144, 147 (Cal. 1935) (per curiam) ("[I]n accepting the unscreened seat, even temporarily, with full knowledge of the danger attached to so doing, [plaintiff] assumed the risk of injury, which precluded recovery of damages."); *Crane*, 153 S.W. at 1078 ("And if it could not be said that [plaintiff] assumed the risk, still he should not be allowed to recover, since his own contributory negligence [for choosing an unprotected seat] is apparent and indisputable.").

**{25}** Nearly from the outset, courts recognized a baseball rule as a necessary divergence from the prevailing "high degree of care for . . . safety" that is owed to business invitees, given the nature of the game and the relationship between the spectator and the stadium owner or occupant. *Wells v. Minneapolis Baseball & Athletic Ass'n*, 142 N.W. 706, 707-08 (Minn. 1913).

> [T]his [business invitee] rule must be modified when applied to an exhibition or game which is necessarily accompanied with some risk to the spectators. Baseball is not free from danger to those witnessing the game. But the perils are not so imminent that due care on the part of the management requires all the spectators to be screened in.

*Id.* at 708. In limiting the duty, the courts also reasoned that "a large part of those who attend prefer to sit where no screen obscures the view" and owners or occupants have "a right to cater to their desires." *Id.*; *see also Maisonave v. Newark Bears Prof'l Baseball Club, Inc.*, 881 A.2d 700, 706 (N.J. 2005) (noting that "most spectators prefer to sit where they can have an unobstructed view of the game and are willing to expose themselves to the risks posed by flying balls . . . to obtain that view" and that professional baseball is unique "because fans actively engage in the game by trying to catch foul balls" (internal quotation marks and citation omitted)), *superseded by statute,* New Jersey Baseball Safety Act of 2006, L. 2005, c. 362, NJSA 2A:53A-43 to -48, *as recognized in Sciarrotta v. Global Spectrum*, 944 A.2d 630, 632 (N.J. 2008); *Akins*, 424 N.E.2d at 533 ("[M]any spectators . . . desire to watch the contest taking place on the playing field without having their view obstructed or obscured by a fence or a protective net.").

**{26}** While the *Akins* baseball rule arguably once represented a majority approach across jurisdictions to baseball spectator injury claims, a wide variation in the formulation of the baseball rule now exists, making the *Akins* rule the minority approach. Some jurisdictions impose duties on stadium owners greater than those pronounced in *Akins*, yet less onerous than a general duty of ordinary care. *See*, *e.g.*, *Lowe v. Cal. League of Prof'l Baseball*, 65 Cal. Rptr. 2d 105, 106 (Cal. Ct. App. 1997) ("[D]efendants had a duty *not to increase* the inherent risks to which spectators at professional baseball games are regularly exposed and which they assume."); *Jones v. Three Rivers Mgmt. Corp.*, 394 A.2d 546, 550-51 (Pa. 1978) (holding that recovery is barred to those "exposed in the stands of a baseball stadium to the predictable risks of batted balls," but not to those who show that their injury was not the

result of a "common, frequent and expected part of the game" (internal quotation marks and citation omitted)).

**{27}** This shift has been attributed, in part, to a move away from the absolute defenses of contributory negligence and assumption of risk, which functioned as complete bars to plaintiff recovery, to comparative fault tort systems. Fried & Ammon, *supra* at 43 ("Some lawyers involved in baseball negligence cases believed the subtle change toward plaintiff judgments occurred due to the shift in some states from assumption of risk [and contributory negligence] to comparative negligence as a defense."); *see also Akins*, 424 N.E.2d at 533 (noting that the early baseball rule cases "arose prior to the adoption of the comparative negligence rule"). Aside from shifts in tort law, advances in the game and the business of baseball have also been significant factors contributing to court modification of the traditional baseball rule. The common theme among contemporary cases modifying the traditional baseball rule is that spectators injured by baseballs are generally allowed to advance their claim when the injury is the result of some circumstance, design, or conduct neither necessary nor inherent in the game.

**{28}** For example, in *Maisonave*, 881 A.2d at 706-07, the New Jersey Supreme Court recognized that "[i]t would be unfair to hold owners and operators [of baseball stadiums] liable for injuries to spectators in the stands when the potential danger of fly balls is an inherent, expected, and even desired part of the baseball fan's experience." Accordingly, the court applied the *Akins* baseball rule only within the stands–areas "dedicated solely to viewing the game," *id.* at 707, where fly balls are inherent, expected, and even desired. "In contrast, multi-purpose areas, such as concourses and playground areas, are outside the scope of the rule," *id.* at 707, and are subject to "a duty of reasonable care," *id.* at 709. In these multi-purpose areas, "[t]he validity of the baseball rule diminishes" because "[f]ans foreseeably and understandably let down their guard when they are in other areas of the stadium" where the fan "is no longer trying to catch foul balls or even necessarily watching the game," *id.* at 708, and so fly balls are neither expected nor desired.

**{29}** The New Jersey court understood that applying the "old [baseball rule] to a sport that has changed tremendously in the last seventy years" poses "pragmatic difficult[ies]." *Id.* (internal quotation marks and citation omitted). Specifically, the court noted that players are faster and stronger than in the past, and marketing techniques employed at games create "a sensory overload of distractions," *id.* (internal quotation marks and citation omitted); therefore, "[t]he limited duty rule does not accommodate all of the activities that are part of today's game, nor does it take into account that players can hit baseballs harder and farther." *Id.*

**{30}** Additionally, the *Maisonave* court also expressed concern about the ability of the spectators to protect themselves from balls leaving the field of play. *Id.* at 708-09. The court noted "[t]he fact that [c]hildren and seniors are an important part of minor league games underscores our concern" for the implicit reason that old and young spectators may be poorly equipped to protect themselves from sharply hit balls or less likely to remain

11

attentive to the action on the field. *Id.* (alteration in original) (internal quotation marks and citation omitted). Thus, while minor league clubs especially market their games as family events for young and old, the effect of the baseball rule has been to insulate stadium owners from legal responsibility so "they are under little pressure to add more protection for fans," *id.* at 706 (internal quotation marks and citation omitted), even when they employ the distractions for their own benefit to attract patrons least able to defend themselves. Noting these changes to viewing and playing the game, the *Maisonave* court echoed a prominent concern raised by the dissent in *Akins*. "The [*Akins*] ruling will . . . foreclose juries in the future from considering the wide range of circumstances of individual cases, as well as new developments in safety devices or procedures. . . . [The *Akins* Court] has frozen a position that is certain to become outdated, if it is not already." *Akins*, 424 N.E.2d at 537 (Cooke, C.J., dissenting).

**{31}** Even before *Akins*, courts in other jurisdictions did not adopt a baseball rule as limited as the rule adopted by the *Akins* court. In *Blakeley v. White Star Line*, 118 N.W. 482 (Mich. 1908), the plaintiff was injured by a wildly thrown ball while at an amusement park watching dancers in a pavilion near a baseball diamond. *Id.* at 482 (syllabus of the court). The players who threw the ball were removed from the diamond by players who had properly reserved it for play. *Id.* The former had nonetheless resumed their play in an area between the diamond and the dance pavilion not intended for baseball play, at which point the errant throw was made. *Id.* The *Blakeley* court essentially set out the language for what would become a baseball rule.

> It is knowledge common to all that in these games hard balls are thrown and batted with great swiftness; that they are liable to be muffed or batted or thrown outside the lines of the diamond, and visitors standing in position that may be reached by such balls have voluntarily placed themselves there with knowledge of the situation, and may be held to assume the risk. They can watch the ball, and may usually avoid being struck. . . .
>
> . . . .
>
> So the defendant in its private park may establish places for a sport dangerous to those visitors who choose to come within the radius of danger, without incurring liability for an injury.

*Id.* at 483-84. Despite this statement, the court held the proprietor of the park was potentially liable for the plaintiff's injuries. The plaintiff "was not in any danger from a ball game played at the *customary place*" because errant balls from the diamond could not have reached the plaintiff standing near the dance pavilion. *Id.* at 483 (emphasis added). The plaintiff, however,

> had no reason to anticipate a game of throw and catch off the diamond, and in close proximity to the dancing pavilion. The defendant should not have

12

permitted such a game in close proximity to a crowd of visitors, without giving notice, or making proper arrangement for the protection of its visitors.

*Id.* Therefore, the baseball rule was held inapplicable and "[t]he defendant owed [the plaintiff] a duty, and that was either to prevent the game at that unusual place, or to notify him and other visitors that it was to be played." *Id.*

**{32}** In *Cincinnati Baseball Club Co. v. Eno*, 147 N.E. 86 (Ohio 1925), the plaintiff was sitting in an unscreened portion of the grandstand between games of a double-header when she was struck by a ball that was batted, not from home plate, but from along side the foul line, where players were practicing a mere fifteen to twenty-five feet from the grandstand between games of a double-header. *Id.* at 86, 88. This peculiar fact scenario led the *Eno* court, despite expressly adopting the baseball rule, to hold that "[u]nder such circumstances . . . it was [the management's] duty to exercise ordinary care not to invite [the plaintiff] into danger, and to that end it was its duty to exercise ordinary care to render the premises reasonably safe," and so "should not lead its invited guests into *unusual dangers*." *Id.* at 88 (emphasis added); *see also id.* at 87 (noting that the court "concur[red] in the soundness of the views expressed in the [cited] cases" employing the baseball rule, and would have barred recovery under the theory that defendants were negligent in not screening the area of the grandstand where plaintiff sat).

**{33}** In *Maytnier v. Rush*, 225 N.E.2d 83 (Ill. App. Ct. 1967), the plaintiff requested a seat near the Chicago Cubs dugout and received a seat in the front row, adjacent to the team's bullpen, which was located in foul ball territory between the third-base foul line and the stands. *Id.* at 85-86. "The seat occupied by plaintiff was in such a position that it required him to look to his right to see the pitcher and batter in the game and to his left to see the bullpen activity." *Id.* at 86. "[T]he plaintiff was struck by a ball, not in play in the game, coming from [the bullpen to] his left at a time when the spectators' attentions were focused on the ball actually in play in the game, to plaintiff's right." *Id.* at 89. Despite holding that the duty of care required by a baseball stadium is met "if they provide [a] screen for the most dangerous part of the grandstand and for those who may be reasonably anticipated to desire protected seats," the *Maytnier* court nonetheless held the defendant owed a duty. *Id.* at 87 (internal quotation marks and citation omitted). "It does not necessarily follow, however, that once an owner of a ballpark has provided an adequate fenced-in area for the most dangerous part of the grandstand he has thereafter exculpated himself from further liability . . . ." *Id.* The court found the facts of the case distinguishable from cases where the baseball rule had been applied to limit the defendant's liability because, by implication, those injuries arose out of the normal consequence of playing the game or were largely plaintiff's fault for failing to protect himself or herself. *See id.* at 89 (citing to a case where plaintiff was denied recovery because of "his failure to keep his eye on the ball, a ball that was in play" (internal quotation marks and citation omitted)). The court, however, reasoned that the plaintiff in *Maytnier* was doing only what could be expected to protect himself, which was to be attentive to the ball in play.

13

**{34}** Similarly, the Pennsylvania Supreme Court adopted a different form of the baseball rule it titled the "place of amusement [rule]" (internal quotation marks omitted), noting that the rationale for a limited-duty rule that "does not impose a duty to protect from risks associated with baseball, naturally limits its application to those injuries incurred as a result of risks any baseball spectator must and will be held to anticipate." *Jones*, 394 A.2d at 551. Therefore, "[e]vidence that an injured party was exposed in the stands of a baseball stadium to the predictable risks of batted balls . . . is not sufficient to establish, prima facie, a breach of the standard of care owed a baseball patron by a stadium operator." *Id.* at 550. "Only when the plaintiff introduces adequate evidence that the amusement facility in which he was injured deviated in some relevant respect from established custom will it be proper for an 'inherent-risk' case to go to the jury." *Id.* This is because "'no-duty' rules[] apply only to risks which are 'common, frequent and expected,' and in no way affect the duty of . . . sports facilities to protect patrons from foreseeably dangerous conditions not inherent in the amusement activity." *Id.* at 551 (citation omitted).

**{35}** Adopting this form of the baseball rule, the Pennsylvania court focused its analysis first on whether a patron hit by a ball batted during pre-game practice was owed a duty under the "rule applicable to common, frequent and expected risks of baseball or by the ordinary [care] rules applicable to all other risks which may be present in a baseball stadium." *Id.* In *Jones*, the plaintiff was "properly using an interior walkway," *id.* at 551, within the stadium in the right-field area of the ball park when a batted ball entered the concourse through one of several large openings in the wall, designed so that "pedestrians may look out over the field and stands," and struck her in the eye, *id.* at 548. The court determined that "[t]he openings built into the wall . . . are an architectural feature of Three Rivers Stadium which are not an inherent feature of the spectator sport of baseball. They are not compelled by or associated with the ordinary manner in which baseball is played or viewed." *Id.* at 551. As "these concourse openings simply cannot be characterized as part of the spectator sport of baseball" (internal quotation marks omitted), the court determined that the plaintiff could not be barred from recovering for her injuries, and found that the trial court was in error "when it extended to [the plaintiff], standing in this walkway, the no-duty rule applicable to patrons in the stands." *Id.* at 552. Because the baseball rule did not apply to the concourse, the plaintiff was able to establish breach of the applicable standard of care by showing that the walkway's "structure required patrons to turn their attention away from any activity on the field in order to safely navigate the concourse," and that the plaintiff "was not aware that batting practice had begun and did not see home plate." *Id.* at 553.

**{36}** The California appellate court in *Brown v. San Francisco Ball Club, Inc.*, 222 P.2d 19 (Cal. Dist. Ct. App. 1950), laid the groundwork for a significant shift in baseball spectator liability cases in California by initially adopting a baseball rule that imposed a relative and mutual duty on the owner/occupant and the spectator, as defined by the inherent and incidental aspects of the sport itself. The court noted that "the duty of self-protection rests upon the invitee," thereby reducing "the duty of the invitor to protect." *Id.* at 20. The extent of the relative duties depended on many factors, including the fact that in baseball, because the spectator is an active participant, the spectator subjects himself or herself to risks

14

necessarily and usually incident to and inherent in the game. *Id.* "This does not mean that he assumes the risk of being injured by the proprietor's negligence but that by voluntarily entering into the sport as a spectator he knowingly accepts the reasonable risks and hazards inherent in and incident to the game." *Id.* Therefore, baseball patrons are responsible for protecting themselves from the "risks necessarily and usually incident to and inherent in the game" of baseball, *id.*, but not the risks created by the owner or occupant's negligence because those are outside the relative and mutual expectations of the parties.

**{37}** California advanced the relative and mutual duties approach in *Knight v. Jewett*, 834 P.2d 696, 697 (Cal. 1992) (in bank), a case about the duty owed by co-participants engaged in a game of pick-up football. The California Supreme Court determined that "whether the defendant owed a legal duty to protect the plaintiff from a particular risk of harm . . . turn[s] on . . . the nature of the activity or sport in which the defendant is engaged and the relationship of the defendant and the plaintiff to that activity or sport." *Id.* at 704. This determination, echoing *Brown*'s rationale, set up the holding that "defendants generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself . . . [but] do have a duty to use due care *not to increase the risks* to a participant *over and above those inherent in the sport.*" *Knight*, 834 P.2d at 708 (emphasis added).

**{38}** With this legal backdrop, a division of the California Court of Appeals modified the state's earliest baseball rule to hold that "the key inquiry [in baseball spectator injury cases] is whether the risk which led to plaintiff's injury involved some feature or aspect of the game which is inevitable or unavoidable in the actual playing of the game." *Lowe*, 65 Cal. Rptr. 2d at 111. In *Lowe*, the plaintiff had been bumped repeatedly by the tail of the minor league ball club's seven-foot tall mascot who was performing "antics" in the aisle behind plaintiff's seat while the ball was in play. *Id.* at 106. The plaintiff was hit in the face by a foul ball immediately after he had turned around in his seat to determine what had been bumping him on the back of the neck and head. *Id.* The *Lowe* court determined that eliminating foul balls would make the game impossible to play, and therefore that foul balls "represent an inherent risk to spectators attending baseball games," whereas "the antics of the mascot are not an essential or integral part of the playing of a baseball game." *Id.* at 111. Accordingly, the court determined that "whether such antics increased the inherent risk to plaintiff is an issue of fact to be resolved at trial." *Id.*

**{39}** From these seminal and contemporary baseball spectator injury cases, it is clear that the baseball rule, rigid as it may be for injuries arising from necessary and inherent aspects of the game, historically has not been applied to preclude recovery for spectators injured in extraordinary circumstances, where conduct or situations–even stadium design flaws–leading to injury were beyond the norm. Therefore, when a stadium owner or occupant has done something to increase the risks beyond those necessary or inherent to the game, or to impede a fan's ability to protect himself or herself, the courts have generally, and we believe correctly, allowed claims to proceed for a jury to determine whether the duty was breached.

**{40}** After reviewing the history of baseball spectator injury cases and the rationale and

15

policy choices motivating those decisions, we believe that commercial baseball stadium owners/occupants owe a duty to their fans that is justifiably limited given the unique nature of their relationship, as well as the policy concerns implicated by this relationship. Accordingly, New Mexico's traditional common-law framework for land owners and occupants that would otherwise prescribe a standard duty of ordinary care is inapposite in the limited circumstance of spectator injuries resulting from the play of commercial baseball. At the same time, we reject the baseball rule pronounced in *Akins* because of its extreme and unyielding results. Instead, we modify the duty owed by commercial baseball stadium owners/occupants.

**{41}** We hold, therefore, that an owner/occupant of a commercial baseball stadium owes a duty that is symmetrical to the duty of the spectator. Spectators must exercise ordinary care to protect themselves from the inherent risk of being hit by a projectile that leaves the field of play and the owner/occupant must exercise ordinary care not to increase that inherent risk. This approach recognizes the impossibility of playing the sport of baseball without projectiles leaving the field of play. This approach also balances the competing interests of spectators who want full protection by requiring screening behind home plate consistent with the *Akins* approach and allowing other spectators to participate in the game by catching souvenirs that leave the field of play. In addition, it balances the practical interest of watching a sport that encourages players to strike a ball beyond the field of play in fair ball territory to score runs with the safety and entertainment interests of the spectators in catching such balls. As long as the owner/occupant exercises ordinary care not to increase the inherent risk of being hit by a projectile leaving the field, he or she need not be concerned about adverse social and economic impacts on the citizens of New Mexico. While not of paramount concern, this approach will bring New Mexico in line with the vast majority of jurisdictions that have considered the issue.

**{42}** Finally, it is consistent with New Mexico case law to modify the duty owed in the context of participatory sporting events when a risk of physical injury is inherent to the activity. Similar to what California did in the *Knight* case, New Mexico has limited the duty owed by co-participants in activities involving physical contact and inherent risk of injury. *See Kabella v. Bouschelle*, 100 N.M. 461, 463, 672 P.2d 290, 292 (Ct. App. 1983) (duty owed by co-participant in football game bars recovery for injuries resulting from "normal risks . . . permitted by the rules of the sport" because "[s]uch risks are . . . inherent to the playing of the sport").

## IV. DEFENDANTS DID NOT MAKE A PRIMA FACIE CASE ENTITLING THEM TO SUMMARY JUDGMENT

**{43}** In this case, Defendants filed a motion for summary judgment relying exclusively on the baseball rule, which we have rejected, and an affidavit that proved their compliance with that rule. Summary judgment may be proper when the moving party establishes a prima facie case for summary judgment. *Romero v. Philip Morris Inc.*, 2010-NMSC-035, ¶ 10, ___ N.M. ___, ___ P.3d ___ (No. 31,433, June 25, 2010). Once this prima facie showing has

16

been made, the burden shifts to the non-movant to adduce evidence that would justify a trial on the merits. *Id*. The non-moving party may not simply rely upon the allegations of his or her pleading. Rule 1-056(E) NMRA. Because resolution on the merits is favored, a reviewing court "view[s] the facts in a light most favorable to the party opposing the motion and draw[s] all reasonable inferences in support of a trial on the merits." *Handmaker v. Henney*, 1999-NMSC-043, ¶ 18, 128 N.M. 328, 992 P.2d 879.

**{44}** Here, it was insufficient for Defendants' prima facie case to simply rely on an affidavit that established their compliance with the baseball rule we have rejected. To make their prima facie case, Defendants must establish that there is not a genuine issue of material fact and that they are entitled to a judgment as a matter of law, based on the limited duty we announce today. We therefore remand this matter to the district court for proceedings consistent with this Opinion.

## V.    CONCLUSION

**{45}** The Court of Appeals rejection of a limited-duty rule is reversed. We adopt a limited-duty rule that applies to owner/occupants of a commercial baseball facility. Under the duty we adopt, an owner/occupant of a commercial baseball stadium owes a duty that is symmetrical to the duty of the spectator. Spectators must exercise ordinary care to protect themselves from the inherent risk of being hit by a projectile that leaves the field of play and the owner/occupant must exercise ordinary care not to increase that inherent risk. Defendants did not make a prima facie case for their entitlement to a summary judgment under the limited duty we announce today, and therefore this matter is remanded to the district court for further proceedings consistent with this Opinion.

**{46}    IT IS SO ORDERED.**

_____

**EDWARD L. CHÁVEZ, Justice**

**WE CONCUR:**

_____

**CHARLES W. DANIELS, Chief Justice**

_____

**PATRICIO M. SERNA, Justice**

_____

**PETRA JIMENEZ MAES, Justice**

_____

**RICHARD C. BOSSON, Justice**

**Topic Index for *Edward C. v. City of Albuquerque*, Docket Nos. 31,907 & 31,917**

| | |
|---|---|
| **CP** | **CIVIL PROCEDURE** |
| CP-SJ | Summary Judgment |
| | |
| **NG** | **NEGLIGENCE** |
| NG-AR | Assumption of Risk |
| NG-BD | Breach of Duty |
| NG-CU | Comparative Negligence |
| NG-DU | Duty |
| NG-FR | Foreseeability |
| NG-LA | Liability, General |
| NG-PI | Personal Injury |
| | |
| **TR** | **TORTS** |
| TR-PS | Premises Liability |